IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE

Assigned on Briefs December 13, 2017

## STATE OF TENNESSEE v. DINNIE MEREL ROBERTSON

**Appeal from the Circuit Court for Lawrence County**
**Nos. 31906, 33049, 33414  Russell Parkes, Judge**

_____

### No. M2016-02409-CCA-R3-CD

_____

The Appellant, Dinnie Merel Robertson, was convicted in the Lawrence County Circuit Court in case number 31906 of two counts of felony vandalism, carrying a firearm with the intent to go armed, and misdemeanor reckless endangerment. Subsequently, he pled guilty in the Lawrence County Circuit Court in case number 33049 to two counts of retaliation for past action. The Appellant received an effective four-year sentence in case number 31906 and an effective two-year sentence in case number 33049 to be served consecutively as ten months in confinement followed by supervised probation. The Appellant then was convicted in the Lawrence County Circuit Court in case number 33414 of selling one-half gram or more of methamphetamine and selling Clonazepam and received an effective ten-year sentence to be served in confinement and consecutively to the effective six-year sentence. The trial court also revoked the Appellant's probation in case numbers 31906 and 33049 and ordered that he serve his sentences in those cases in confinement. In this consolidated appeal, the Appellant contends that the evidence is insufficient to support his convictions in case number 33414, that the trial court erred by ordering that he serve his effective ten-year sentence in that case consecutively to his prior sentences, and that the trial court erred by denying his request for probation. He also contends that the trial court erred by revoking his probation in case numbers 31906 and 33049 and ordering that he serve those sentences in confinement. Based upon the record and the parties' briefs, we affirm the judgments of the trial court but remand the case for correction of the judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed,**
**Case Remanded**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and TIMOTHY L. EASTER, JJ., joined.

Brandon E. White (on appeal) and Robert Stovall, Jr., and Travis Jones (at trial), Columbia, Tennessee, for the appellant, Dinnie Merel Robertson.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Counsel; Brent A. Cooper, District Attorney General; and Gary Howell, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

## I.  Factual Background

On September 26, 2013, the Lawrence County Grand Jury indicted the Appellant in case number 31906 for one count of attempted first degree murder, a Class A felony; two counts of vandalism of property causing damage of $1,000 or more, a Class D felony; three counts of aggravated animal cruelty, a Class E felony; one count of reckless endangerment, a Class E felony; and one count of carrying a firearm with the intent to go armed, a Class C misdemeanor.  On direct appeal of the Appellant's convictions, this court gave the following factual account of the crimes:

> Travis Springer testified that on June 23, 2013, he received a phone call from his wife, who was a manager of a Mapco gas station in Lawrence County.  Mr. Springer's wife complained that her truck was "making a squealing racket."  Mr. Springer went to the gas station to check on his wife's truck and discovered that two of the truck's tires had been slashed.  Mr. Springer changed the tires on his wife's truck and then went into the gas station to watch its security camera footage.  Mr. Springer saw a gray Pontiac pull up beside his wife's truck on the security camera footage.
>
> Mr. Springer testified that the car belonged to the Defendant, who was sitting in the passenger seat, and was being driven by the Defendant's girlfriend.  The Defendant's girlfriend got out of the car and went into the gas station to purchase some beer.  Mr. Springer also saw a man, whom he later identified as David Pruitt, get out of the backseat of the car and smoke a cigarette.  When the Defendant's girlfriend returned to the car, Mr. Pruitt "went around to the left side [of Mr. Springer's wife's truck] away from the camera."  Mr. Pruitt returned to the Defendant's car a few moments later, and "they drove off."
>
> Mr. Springer testified that when he first watched the security camera footage, he did not know who the man in the backseat of the car was.  Mr. Springer decided to go to the Defendant's house and confront him "about what was going on."  Mr. Springer testified that he had known the Defendant since they were children.  When he got to the Defendant's house

that day, the Defendant offered Mr. Springer a beer. Mr. Springer declined and said that he wanted to know what "all the tire cuttings [were] about." Mr. Springer testified that the Defendant replied, "I got it in for your old lady."

Mr. Springer then asked the Defendant who was in the backseat of his car at the Mapco station. The Defendant denied that anyone had been in the backseat of his car and threatened to "whoop [Mr. Springer's] behind" for "accusing" him. Mr. Springer testified that he got out of his truck, and the Defendant began hitting him. According to Mr. Springer, the Defendant hit him until he was "down to [his] knees." Mr. Springer testified that he then unholstered his pistol and pistol-whipped the Defendant twice on the side of his head. With the Defendant on the ground, Mr. Springer got back into his truck and drove away.

Sometime between 3:30 and 4:00 p.m. the next day, Mr. Springer, as was his routine, went to his farm to feed his four horses. When he arrived, Mr. Springer found his neighbor, Edward Willis, tending to one of his horses. The horse, named Colty, "was just lifeless," had blood "dripping off [its] head," and "had shots all through [its] ears." Mr. Springer discovered that an older horse, named Tony, had been shot "right in [its] neck" and that another horse, named Blaze, had over 100 pellets shot into its side. Mr. Springer also discovered that his tractor "had been shot through the radiator and the left rear tire."

Mr. Springer testified that as he was tending to his horses, he received a phone call from his friend James Kenneth Wayne. Mr. Springer estimated that this was between 4:30 and 5:30 p.m. While he was on the phone with Kenneth, Mr. Springer saw the Defendant's car go by. Mr. Springer testified that he saw the Defendant's girlfriend driving the car and the Defendant in the passenger seat. Mr. Springer further testified that he saw "a gun barrel sticking out the [passenger side] window" and that "the gun was pulled back in the vehicle" as it passed him.

Mr. Springer testified that Colty eventually lost its left eye and became very "jumpy." Tony never recovered from being shot in the neck, "lost a bunch of weight," and could no longer be ridden. Mr. Springer testified that he could still ride Blaze but that all of the shotgun pellets remained under its hide. Mr. Springer further testified that his tractor had a "busted" radiator and that he had to replace the radiator, the hood of the tractor, and a hose. Mr. Springer estimated that he spent $520 repairing his

tractor and estimated that the bill from a veterinarian to examine the horses was $165.

Mr. Springer's neighbor, Mr. Willis, testified that on June 24, 2013, his girlfriend "heard some shots she thought were like firecrackers." This caused Mr. Willis to look out one of his windows, and he saw one of Mr. Springer's horses "outside the fence." Mr. Willis went to check on the horse and saw that its "face was all bloody." Mr. Willis led the horse back to Mr. Springer's farm, tried to clean the horse, and "repaired the fence where nobody else would get out."

Mr. Willis recalled that when Mr. Springer showed up, they checked on the other horses. Mr. Willis testified that while they were checking on the other horses, he saw two people drive by with a shotgun barrel "sticking out the [car's] window." Mr. Willis further testified that he believed the car was "a medium blue Chevy" but that it "was hard to tell . . . the way they make cars anymore." Mr. Willis also testified that he did not know the Defendant and that he did not recall seeing the Defendant in the car that day.

Jamie Wayne testified that he had known the Defendant for a "[l]ong time." Jamie recalled that on the afternoon of June 23, 2013, the Defendant came by his house. Jamie explained that he did body work on cars and had a shop at his house. According to Jamie, the Defendant was driving a silver Pontiac and wanted to know if he "had seen Mr. Springer." Jamie told the Defendant that he had not seen Mr. Springer, and the Defendant responded that he was "looking for" Mr. Springer. Jamie recalled that the Defendant did not look "too good" and had "a cut on his forehead." Jamie further testified that the Defendant was acting "[k]ind of erratic."

The next day, June 24, 2013, Jamie saw the Defendant's Pontiac being driven down his street. Jamie recalled that the Defendant was in the passenger seat and that the driver "might have been [the Defendant's] girlfriend." After the car was driven away, Jamie heard a gunshot. Jamie testified that he did not recall seeing a gun in the car when it drove by and that the car was too far away for him to see if the gunshot came from the car. Jamie further testified that he was on the phone with his father, Kenneth, when he heard the gunshot.

Kenneth testified that he was a friend of Mr. Springer's and that he knew the Defendant because the Defendant "was an associate of [his] son."

- 4 -

Kenneth recalled that on June 23, 2013, Mr. Springer "pulled up in [his] driveway," and they talked for a few minutes. Kenneth testified that Mr. Springer's truck was visible from the road, and he remembered seeing "a silver car" go by during their conversation.

The next day, June 24, 2013, Kenneth was working in his "out-shed" that afternoon when he "heard a shot." Kenneth "stepped outside" and saw the "backend of a silver car go out of sight." Kenneth thought that somebody had driven by and "just shot in the air or something." Kenneth got into his SUV, which was parked in his driveway, and "went out to the convenience store." On the way to the convenience store, Kenneth called Mr. Springer to tell him about the gunshot he heard, and Mr. Springer told Kenneth about his horses having been shot.

When Kenneth returned from the convenience store, he parked his SUV in front of his garage. Kenneth then went into the garage to put the beer he had just purchased into "a little refrigerator that [sat] right inside [his] garage." A few minutes after Kenneth got out of his SUV, he heard another gunshot. Kenneth testified that he looked out of his garage and saw "the back windows of [his SUV] just shatter, and . . . go up in the air." Kenneth further testified that he saw a silver Pontiac, which he identified as the Defendant's car, accelerating away from his house. Kenneth recalled that the driver's side of the Pontiac was "closest to [his] house." Kenneth called Jamie after the shooting to tell him about it, and Jamie said that he could see the car being driven away.

Kenneth admitted that he did not see the shooter, and he did not see who was inside the Defendant's car as it was being driven away from his house. Kenneth also stated that he did not believe the shooter intended to kill him because a large hedge obscured part of his garage and likely prevented the shooter from seeing him inside the garage. Kenneth testified that when he later trimmed the hedge he discovered shotgun pellets "all over the side of [his] house." Kenneth further testified that the shotgun blast to his SUV damaged the tailgate and the interior of the vehicle in addition to blowing out the rear windows. Kenneth received an estimate that repairing the damage would cost $3,600.

Sergeant Melinda Brewer of the Lawrence County Sheriff's Department testified that on June 24, 2013, she was dispatched to Mr. Springer's farm regarding the shooting of his horses. While in route to Mr. Springer's farm, Sgt. Brewer was informed that there had been a second

"call of shots fired" and that the suspect vehicle was "coming toward where [she] was at." Sgt. Brewer and several other officers "staged up" to stop the vehicle. The officers stopped a silver Pontiac with two people inside. Sgt. Brewer testified that she approached the passenger side of the car and could "see the butt of a gun" leaning against the passenger side door. Sgt. Brewer reached into the car and removed the gun.

The Defendant was in the passenger seat of the car, and his girlfriend was in the driver's seat. Sgt. Brewer testified that the Defendant smelled of alcohol. Inside the car, Sgt. Brewer found "an opened container of beer," a box of shotgun shells, and loose shotgun shells in the car's console and the floorboard of the passenger seat. Sgt. Brewer testified that the box stated that it contained twenty-five shotgun shells, but there were only ten in the box when she confiscated it. Sgt. Brewer admitted that she did not find any spent shotgun shells inside the car and that the shotgun was unloaded when she removed it from the car. Sgt. Brewer testified that she believed that the shotgun was operational but that she never test fired it.

Sgt. Brewer recalled that when the Defendant was arrested, he was "ranting about the fact that [they had] got the wrong person," told them that he had been assaulted, and was "trying to show [them] his injury." Officer Zach Newton of the Saint Joseph Police Department testified that he assisted in the Defendant's arrest. Officer Newton recalled that the Defendant had the shotgun "in [his] lap" when the car was stopped. Officer Newton further recalled that as he was transporting the Defendant to jail, the Defendant seemed "pretty upset" and said that the officers "would be working a murder when he got out, because he would kill them next time."

State v. Dinnie Merel Robertson, No. M2015-01137-CCA-R3-CD, 2016 WL 3177010, at *1-4 (Tenn. Crim. App. at Nashville, May 27, 2016) (footnote omitted).

On January 21, 2015, the jury convicted the Appellant of reckless endangerment of Kenneth Wayne, a Class A misdemeanor, as a lesser-included offense of attempted first degree murder; three counts of animal cruelty, Class A misdemeanors, as lesser-included offenses of aggravated animal cruelty; one count of vandalizing Kenneth Wayne's Chevrolet Tahoe causing damage of $1,000 or more but less than $10,000, a Class D felony; one count of vandalizing Travis Springer's tractor causing damage of more than $500 but less than $1,000, a Class E felony; and one count of carrying a firearm with the intent to go armed, a Class C misdemeanor. The jury acquitted the Appellant of felony reckless endangerment of Travis Springer.

- 6 -

On February 4, 2015, while the Appellant was awaiting sentencing and out on bail in case number 31906, he threatened Jamie and Kenneth Wayne, who had testified against him at trial. As a result, on March 11, 2015, the Lawrence County Grand Jury indicted him in case number 33049 for two counts of retaliation for past action, a Class E felony. On April 13, 2015, the Appellant entered an "open" plea to the charges. That same day, Judge Stella Hargrove held a sentencing hearing for both cases and ordered that the Appellant serve an effective four-year sentence in case number 31906 and an effective two-year sentence in case number 33049. The trial court noted that the Appellant was required to serve the effective two-year sentence consecutively to the effective four-year sentence pursuant to Tennessee Rule of Criminal Procedure 32(c)(3) because he committed the offenses in case number 33049 while he was on bail in case number 31906. The court ordered that the Appellant serve ten months of the effective six-year sentence in confinement, with no credit for time served in jail, and that he serve the remainder of the sentence on supervised probation.

On direct appeal of his convictions in case number 31906, this court reversed the Appellant's convictions of animal cruelty because the statute for the charged offense, aggravated animal cruelty, expressly excluded horses. Id. at *5. Thus, the three counts of aggravated animal cruelty failed to state an offense, and "the trial court lacked the authority to allow the continued prosecution of the [Appellant] on the void indictments by instructing the jury on the offense of cruelty to animals." Id. However, this court affirmed the Appellant's remaining convictions.[1]

On August 10, 2015, just four months after the Appellant's sentencing hearing in case numbers 31906 and 33049, the Lawrence County Grand Jury indicted him in case number 33414 for selling one-half gram or more of methamphetamine on May 9, 2014, and selling Clonazepam on May 23, 2014. At trial, John Myers testified that he was an investigator with the Lawrence County Sheriff's Department's Drug Unit from 2013 to 2014. In May 2014, Jonathan Gooch, an informant, contacted Investigator Myers and advised him that Gooch could buy methamphetamine from the Appellant at "a residence that belonged to a Pruitt Subject" on Gieske Road. Based on Gooch's information, Investigator Myers set up a controlled drug buy between Gooch and the Appellant at David Pruitt's residence. Investigator Myers said that Gooch worked with the sheriff's department "on a few different cases" but that he did not remember if those cases occurred before or after Gooch's work in the instant case.

Investigator Myers testified that prior to the drug buy, he investigated Pruitt and the Appellant. He also used Google Earth to look at Gieske Road and determined that

---

[1] The reversal of the Appellant's three convictions of animal cruelty did not affect his effective four-year sentence in case number 31906.

"it's a hard road to actually park somewhere and watch the transaction." On May 9, 2014, Investigator Myers and Investigator Greg Mayes met with Gooch and Gooch's girlfriend on a rural side road off Rabbit Trail Road. The officers searched Gooch, his girlfriend, and the couple's vehicle. The officers gave Gooch $100 of "recorded" money for the drug buy and a recording device that looked like a wristwatch. Investigator Myers said that the device was strictly for recording the drug buy and that he could not hear or see the transaction while it was occurring.

Investigator Myers testified that he and Investigator Mayes followed Gooch and Gooch's girlfriend to Gieske Road. The couple turned onto Gieske while the officers "kept going." The officers drove to a cemetery off Rabbit Trail Road where they were supposed to meet Gooch and his girlfriend after the transaction. Investigator Myers said that "[a]fter a period of time," Gooch had not arrived at the cemetery, so Investigator Myers decided to "go check on him." The officers rode by Pruitt's home on Gieske Road in their unmarked police car and saw Gooch, his girlfriend, and "a couple of other guys" in the front yard. The officers returned to the cemetery, and Gooch and his girlfriend arrived thirty minutes to one hour later.

Investigator Myers testified that Gooch turned over a white powdery substance in a clear plastic bag and that Gooch claimed to have purchased the substance from the Appellant. Investigator Myers field-tested the substance, and it was positive for methamphetamine. The methamphetamine weighed one gram. The officers searched Gooch, his girlfriend, and their vehicle but did not find any drugs. Investigator Myers returned to the sheriff's department to watch the video recording of the drug buy. However, the device had failed to record anything. Investigator Myers stated, "I don't know if it was user error or if there was a problem with the equipment. But we didn't -- it never started."

Investigator Myers testified that on May 23, 2014, Gooch contacted him and claimed he could buy ten Klonopin pills from the Appellant at the Pruitt residence. Investigator Myers and Investigator John Roberts followed the same procedure from May 9, followed Gooch and his girlfriend to Gieske Road, and waited for them in the cemetery. Gooch and his girlfriend arrived at the cemetery about one hour later, and Gooch gave eleven pills to Investigator Myers. Investigator Myers watched the video from the recording device and saw a small blue pickup truck in the video. He later learned the truck belonged to the Appellant. He said that in exchange for Gooch's cooperation in the drug buys, the sheriff's department either paid Gooch or "helped him out on some trouble that his brother might have been in."

On cross-examination, Investigator Myers acknowledged that in order for Gooch to earn money or help for his brother, Gooch had to bring drugs to the cemetery on May 9

and May 23. He also acknowledged that a female officer was not present on May 9 or 23; accordingly, the officers conducted "low-level" searches of Gooch's girlfriend. On May 9, Gooch and his girlfriend were completely out of Investigator Myers's sight for about one and one-half hours, and they were completely unmonitored during that time. Investigator Myers acknowledged that after the May 9 transaction, Gooch told him that the Appellant "had to leave Pruitt's residence to go get the methamphetamine to come back with it." Investigator Myers said that the May 23 video recorded a person that "look[ed] a lot like" the Appellant but that he could not say with 100% certainty that the person was the Appellant. He acknowledged that most of the conversation on the May 23 recording was unintelligible and that he did not verify the Appellant owned the blue truck in the video.

Jonathan Gooch testified that he met the Appellant while they were in jail. After Gooch was released, he and the Appellant "hung out and drank together." Gooch described David Pruitt as "just another buddy" and said Pruitt lived on Gieske Road. Gooch had never been to Pruitt's house prior to May 9, 2014.

Gooch testified that two or three weeks before May 9, he talked to law enforcement about buying drugs from the Appellant. Gooch had seen the Appellant with methamphetamine and had talked with the Appellant about buying, selling, and using the drug. On May 9, Gooch spoke with the Appellant on the telephone about Gooch buying methamphetamine, and the Appellant suggested they meet at Pruitt's house. Gooch telephoned law enforcement about the the drug buy and met officers at Liberty Grove Church. The officers patted down Gooch and his wife; searched their car; and gave Gooch "a device" and money to buy one gram of methamphetamine. The device was a wristwatch with a camera on it.

Gooch testified that he and his wife went to Pruitt's house to make the drug buy, that they were outside with Pruitt and the Appellant, and that the officers rode by the house about thirty minutes after they arrived. Pruitt and the Appellant then went into the house. Gooch said, "They stayed in there for a while then they told us when we [could] come in[.]" When Gooch and his wife went into the house, Pruitt and the Appellant were "weighing up the meth." Gooch gave money to the Appellant, and the Appellant gave Gooch a bag of methamphetamine. Gooch said he and his wife drove to where they were supposed to meet the officers and did not stop anywhere.

Gooch testified that two weeks later, officers contacted him about making another drug buy, so Gooch arranged to buy ten Klonopin pills from the Appellant for $10. Again, the Appellant suggested they meet at Pruitt's house. Gooch and his wife went to the house, and Gooch bought ten Klonopin pills from the Appellant. The Appellant gave Gooch one extra pill. Gooch and his wife met with the officers, and Gooch turned over

the eleven pills to the officers. The transaction was video recorded, and the State played the recording for the jury. Gooch identified a voice in the video as that of the Appellant and said that the blue truck in the video was the Appellant's truck.

On cross-examination, Gooch denied using, selling, or "cooking" methamphetamine. The methamphetamine Gooch bought on May 9 came from somewhere inside Pruitt's house. Gooch said that the Appellant did not live in the home but that "[a]fter Dinnie got done weighing it he set it on the bar and I gave him the money and I took the bag." Gooch said he participated in the drug transactions to help his brother.

Jennifer Sullivan, a special agent forensic scientist for the Tennessee Bureau of Investigation, testified as an expert in forensic chemistry that she analyzed the evidence collected in this case. She first tested an off-white powder in a plastic bag. The powder was methamphetamine and weighed 1.01 grams. Agent Sullivan then tested eleven white tablets. The tablets were Clonazepam, also known as Klonopin.

At the conclusion of Agent Sullivan's testimony, the State rested its case. The Appellant did not present any proof, and the jury convicted him as charged of selling one-half gram or more of methamphetamine, a Class B felony, and selling Clonazepam, a Class D felony. After a sentencing hearing, the trial court sentenced the Appellant to concurrent sentences of ten years and three years, respectively. The court ordered that the Appellant serve the sentences consecutively to his previous effective six-year sentence in case numbers 31906 and 33049 and denied his request for probation. In a subsequent probation revocation hearing, the court revoked the Appellant's probation in case numbers 31906 and 33049 and ordered that he serve those sentences in confinement. On appeal, the Appellant challenges the sufficiency of the evidence in case number 33414 and various sentencing decisions made by the trial court in all three cases.

## II. Analysis

### A. Sufficiency of the Evidence in Case Number 33414

The Appellant contends that the evidence is insufficient to support his convictions of selling methamphetamine and Clonazepam in case number 33414 because Jonathan Gooch had a motive to lie about buying drugs from him, the May 9 drug buy was not recorded, Investigator Myers did not follow Gooch to the Pruitt residence on May 9 or 23 or observe the drug buys, and Gooch had time on both occasions to travel somewhere else to obtain the drugs or Gooch's wife could have been hiding the drugs on her person. The State argues that the evidence is sufficient. We agree with the State.

- 10 -

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. Id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

A guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting Marable v. State, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)).

Taken in the light most favorable to the State, the evidence shows that on May 9 and May 23, 2014, Gooch and his wife met with Investigator Myers. Investigator Myers searched the couple and their car; provided Gooch with a recording device; and provided Gooch with money to buy one gram of methamphetamine from the Appellant on May 9 and ten Klonopin pills from the Appellant on May 23. Both transactions were to occur at the Pruitt residence on Gieske Road. On May 9, Investigator Myers followed Gooch and his wife to the turnoff for Gieske Road and then proceeded to a cemetery to wait on them. After waiting for a while, Investigator Myers drove to Gieske Road to check on Gooch and saw him in the yard of the Pruitt residence with the Appellant and Pruitt. Investigator Myers returned to the cemetery to wait. Gooch said that after the officer drove by, he and his wife went inside the Pruitt residence, and he purchased one gram of methamphetamine from the Appellant. Gooch and his wife then drove to the cemetery and gave the methamphetamine to the officer. Although the recording device did not

- 11 -

capture any of the drug buy, Investigator Myers observed Gooch with the Appellant at the Pruitt residence.

On May 23, Investigator Myers again followed Gooch and his wife to the turnoff for Gieske Road and waited for the couple at the cemetery. Gooch said that he went to the Pruitt residence and purchased Klonopin pills from the Appellant. He then went to the cemetery and gave the pills to the officer. This time, the recording device captured the drug transaction. The State played the video for the jury, and Gooch identified the Appellant's voice and truck in the video. The jury, not this court, was in the best position to judge the credibility of the witnesses, and the jury obviously accredited the testimony of Investigator Myers and Gooch. Thus, the evidence is sufficient to support the convictions.

## B. Sentencing in Case Number 33414

Next, the Appellant contends that the trial court erred when it ordered that his effective ten-year sentence for the drug buys in case number 33414 run consecutively to his effective six-year sentence in case numbers 31906 and 33049 because the record did not show that he was a dangerous offender or that his record of criminal activity was extensive. He also contends that the court erred by failing to sentence him to probation in case number 33414. The State argues that the trial court properly sentenced the Appellant. We agree with the State.

At the Appellant's October 17, 2016 sentencing hearing for case number 33414, Tammy Mathis testified for the Appellant that she was a probation and parole officer with the Tennessee Department of Correction, that he had been on supervised probation in case numbers 31906 and 33049 since April 13, 2015, and that he had been serving probation for about eighteen months. The Appellant last reported to his probation officer on October 5, 2016, just twelve days before the sentencing hearing. The Appellant committed the drug offenses in case number 33414 prior to his being placed on probation on April 13, 2015, and the Appellant had not committed any other offenses since that date. Mathis stated that the Appellant had never missed a meeting with his probation officer and that he had reported to the officer more than one time per month for the past five months. She said that she was "sure" he had been drug tested while on probation and that nothing in his file indicated he had failed a drug test. The Appellant was required to pay $45 dollars per month in supervision fees and last paid the fee on August 24, 2016. Mathis stated that the Appellant worked for Killen Trucking Company and that she did not know of any complaints about him. On July 25, 2016, a probation violation report was filed in case numbers 31906 and 33049.

On cross-examination, Mathis read the following from the probation violation report:

Incident was filed on 6/24/16. Stating that the offender had threatened to kill Jonathan Gooch and that the offender had bumped the rear of a car with Jonathan Gooch and [his wife] inside while driving down the road. Jonathan Gooch was a witness in the offender's trial.

The State did not present any witnesses but introduced the Appellant's September 15, 2016 presentence report into evidence. According to the report, the then forty-two-year-old Appellant was married with two daughters, ages ten and eight, and a stepdaughter. He graduated from high school in 1992 and obtained his commercial driver's license from the Truck Driving Institute in 1995. In the report, the Appellant described his physical health as "fair" due to blindness in his left eye and his mental health as "good." The Appellant reported that he was bipolar and took medication for the issue. The Appellant stated in the report that he began consuming alcohol when he was sixteen years old and that he usually consumed six to eight beers on weekends. He also stated that "was usually sober for a week at a time," that he last consumed alcohol on September 6, 2016, and that he was not intoxicated when he committed the crimes. The Appellant stated that he first used marijuana when he was thirty-five years old, that he "seldom [used] the drug," and that he last used marijuana in 2013. In the report, the Appellant denied selling drugs to anyone. The report showed that in addition to the four felony and two misdemeanor convictions in case numbers 31906 and 33049, the Appellant violated the seatbelt law in 2015 and was convicted of misdemeanor domestic violence in 2007.

At the conclusion of the hearing, the trial court stated that it had considered the evidence presented at trial and sentencing, the presentence report, the principals of sentencing, the arguments made by counsel regarding sentencing and alternative sentencing, the nature of the criminal conduct involved, mitigating and enhancing factors, and statistical information provided by the Administrative Office of the Courts. The trial court noted that the Appellant was a Range I, standard offender and applied enhancement factor (1), that "[t]he defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range," to the Appellant sentences due to the Appellant's prior convictions. Tenn. Code Ann. § 40-35-114(1). The trial court also stated that it had reviewed this court's opinion in case number 31906 and that the opinion "details criminal behavior in addition to that necessary to establish the appropriate range." In mitigation, the trial court found that the Appellant's behavior neither caused nor threatened serious bodily injury. See Tenn. Code Ann. § 40-35-113(1). The court found that the enhancing factor outweighed the mitigating factor and sentenced the Appellant to ten years, the midpoint in the range, for

selling one-half gram or more of methamphetamine, a Class B felony, and three years, the midpoint in the range, for selling Clonazepam, a Class D felony. See Tenn. Code Ann. § 40-35-112(a)(2), (4).

Regarding consecutive sentencing, the trial court found that consecutive sentencing was not appropriate and ordered that the Appellant serve the ten- and three-year sentences concurrently for a total effective sentence of ten years. However, the trial court ordered that the Appellant serve the effective ten-year sentence consecutively to the effective six-year sentence in case numbers 31906 and 33049 based upon the Appellant's being a dangerous offender. The trial court specifically addressed the Wilkerson factors and found that confinement for an extended period of time was necessary to protect society from the Appellant and that the aggregate length of the sentences was reasonably related to the offenses for which the Appellant was convicted. The trial court denied the Appellant's request for probation and ordered that he serve his effective ten-year sentence in confinement.

First, the Appellant contends that the trial court abused its discretion by ordering that he serve the effective ten-year sentence consecutively to the effective six-year sentence. Appellate review of the length, range, or manner of service of a sentence imposed by the trial court is to be reviewed under an abuse of discretion standard with a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012); see also State v. Pollard, 432 S.W.3d 851, 859 (Tenn. 2013) (applying the standard to consecutive sentencing); State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012) (applying the standard to alternative sentencing). In conducting its review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the Appellant in his own behalf; and (8) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210; see also Bise, 380 S.W.3d at 697-98. The burden is on the Appellant to demonstrate the impropriety of his sentence. See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.

Consecutive sentencing is appropriate when a defendant is "a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high." Tenn. Code Ann. § 40-35-115(b)(4). Our case law clearly reflects that in order to impose consecutive sentencing based upon finding that a defendant is a dangerous offender, a court must also find that "(1) the sentences are necessary in order to protect the public from further misconduct by

- 14 -

the defendant and [that] (2) 'the terms are reasonably related to the severity of the offenses.'" State v. Moore, 942 S.W.2d 570, 574 (Tenn. Crim. App. 1996) (quoting State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995)); see also State v. Lane, 3 S.W.3d 456, 461 (Tenn. 1999).

Here, the trial court specifically addressed the Wilkerson factors and found that consecutive sentencing was necessary to protect the public from further misconduct by the Appellant and that consecutive sentencing was reasonably related to the severity of the offenses. We agree. In June 2013, the Appellant shot Kenneth Wayne's SUV with a shotgun, shattering his windows and spraying his home with shotgun pellets. Wayne was nearby at the time. The Appellant also drove by Travis Springer and Edward Willis with the barrel of a shotgun protruding from his car window; shot Springer's horses[2]; and damaged Springer's tractor by shooting it with a shotgun. Despite being indicted for various offenses, including attempted first degree murder, the Appellant then sold methamphetamine and Clonazepam to Jonathan Gooch in May 2014. In February 2015, while out on bond for the offenses he committed in June 2013, the Appellant threatened Kenneth and Jamie Wayne, who had testified against him at trial. Victim impact statements attached to the Appellant's April 2, 2015 presentence report in case numbers 31906 and 33049 described the Appellant as "unpredictable," "extremely dangerous," and threatening and reflected that his victims were very afraid of him and what he might do to their families and property. We agree with the trial court that consecutive sentencing was necessary to protect the public from further misconduct by the Appellant and that his effective six-year sentence reasonably related to the severity of the offenses. Thus, the trial court did not err by ordering consecutive sentencing.

The Appellant also contends that the trial court erred by denying his request for probation in case number 33414. An appellant is eligible for alternative sentencing if the sentence actually imposed is ten years or less. See Tenn. Code Ann. § 40-35-303(a). The Appellant's sentences meet this requirement. Moreover, an appellant who is an especially mitigated or standard offender convicted of a Class C, D, or E felony should be considered a favorable candidate for alternative sentencing absent evidence to the contrary. See Tenn. Code Ann. § 40-35-102(6). As a Range I, standard offender, convicted of a Class B felony, the Appellant is not considered a favorable candidate for alternative sentencing for his selling methamphetamine. Tennessee Code Annotated section 40-35-103(1) sets forth the following sentencing considerations which are utilized in determining the appropriateness of alternative sentencing:

---

[2] Although the State mischarged the Appellant in this case, preventing convictions of aggravated animal cruelty or animal cruelty, the Appellant's shooting Mr. Springer's horses certainly qualified as animal cruelty. See Tenn. Code Ann. § 39-14-202(a)(1) (providing that anyone who intentionally or knowingly maims an animal is guilty of animal cruelty).

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

See also State v. Zeolia, 928 S.W.2d 457, 461 (Tenn. Crim. App. 1996). Additionally, "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative or length of a term to be imposed." Tenn. Code Ann. § 40-35-103(5). A defendant with a long history of criminal conduct and "evincing failure of past efforts at rehabilitation" is presumed unsuitable for alternative sentencing. Tenn. Code Ann. § 40-35-102(5).

In denying the Appellant's request for probation, the trial court stated as follows:

Now, as it relates to the probation considerations, the Court has considered the following in deciding to grant or deny any form of alternative sentencing. I have considered the pre-sentence report, I have considered the Defendant's physical and mental condition and social history as detailed therein; the facts and circumstances surrounding the offense; and the nature and circumstances of the criminal conduct. I've also considered the prior criminal history of the Defendant in this particular case, and while not extensive, certainly present. I've also considered the previous actions and/or character of this particular Defendant and whether or not the Defendant might reasonably be expected to be rehabilitated, and the Defendant's potential or lack of potential for rehabilitation including the risks that during the period of probation the Defendant will commit another crime.

Before this Court is a revocation warrant and the Court has taken notice of that warrant as detailed in the testimony by the pre-sentence officer.

- 16 -

The Court has also considered whether or not the interests of society will be protected from possible future criminal conduct of the Defendant, and whether or not there are less restrictive means other than confinement which have recently been unsuccessful to the Defendant. That is not one that the Court is -- while I considered it, I do not believe it to be appropriate for purposes of determining probation considerations.

The Court has considered whether or not a sentence of full probation would unduly depreciate the seriousness of the offense.

The Court finds that probation should not be granted in this case, and thus sentences the defendant to serve 10 years in the Tennessee Department of Corrections.

The trial court's comments demonstrate that it denied probation based on the need to protect society by restraining a defendant who has a long history of criminal conduct, in order to avoid depreciating the seriousness of the offenses, and the Appellant's lack of potential for rehabilitation. Again, we agree with the trial court. Over the course of three years, the Appellant committed six felonies and two misdemeanors, and he threatened two witnesses. His being indicted and convicted in case number 31906 failed to deter him from continuing to commit crimes. Moreover, alcohol apparently has played a role in some of the Appellant's actions, yet he has never sought treatment. Accordingly, he lacks potential for rehabilitation. We conclude that the trial court did not abuse its discretion by denying the Appellant's request for probation.

C. Revocation of Probation in Case Numbers 31906 and 33049

The Appellant contends that the trial court erred by revoking his probation in case numbers 31906 and 33049 based upon his new convictions in case number 33414. The Appellant acknowledges that a published case is adverse to his position but contends that this court should overrule that case or least hold that application of that case to the instant case would produce a fundamentally unfair result. In a related argument, the Appellant contends that the State's delay between the time he committed the crimes in case number 33414 and the State's seeking to revoke his probation in case numbers 31906 and 33049 violated his rights to due process and speedy trial. The State argues that the Appellant is not entitled to relief. We agree with the State.

The Appellant committed the crimes in case number 31906 on June 24, 2013; the crimes in case number 33414 on May 9 and 23, 2014; and the crimes in case number 33049 on February 4, 2015. On April 13, 2015, the trial court sentenced the Appellant in case numbers 31906 and 33049 to an effective six-year sentence and ordered that he

- 17 -

serve the sentence as ten months in confinement and the remainder on supervised probation. The Appellant was indicted in case number 33414 on August 10, 2015, and a jury convicted him on July 1, 2016. On July 25, 2016, the Appellant's probation supervisor in case numbers 31906 and 33049 filed a probation violation report based upon the new convictions in case number 33414 and a June 24, 2016 "incident report," which alleged that the Appellant had threatened to kill Jonathan Gooch and bumped the rear of Gooch's car while Gooch and his wife were in the car. The trial court issued an arrest warrant that same day, and the police arrested the Appellant on August 14, 2016.

At the December 16, 2016 probation revocation hearing, Stephanie Wilburn of the Tennessee Department of Correction testified for the State that she began supervising the Appellant's probation in case numbers 31906 and 33049 on April 13, 2015. On July 25, 2016, she filed the probation violation report due to the new drug convictions in case number 33414 and the incident report in which the Appellant threatened Gooch and Gooch's wife. Wilburn did not conduct an independent investigation of the incident report but talked with the Appellant about it. She said that the Appellant admitted to an encounter with Gooch but that the Appellant "told me that it wasn't how it sounded in the report, that the things didn't happen the way that it was said that it happened. . . . He said it was Jonathan Gooch who actually started the whole thing, he came to his house, not the other way around." The Appellant told Wilburn that he followed Gooch but did not tell her that he bumped Gooch's car. Other than the new convictions and the incident report, Wilburn did not have any complaints about the Appellant.

On cross-examination, Wilburn acknowledged that the Appellant claimed he had been at home when Gooch pulled into his driveway and "initiated whatever happened later on." The Appellant admitted to Wilburn that he followed Gooch and told her that he "probably shouldn't have done that." The Appellant claimed that he acted in self-defense and that the incident was instigated by Gooch. Wilburn acknowledged that she had no firsthand knowledge of the incident. She also acknowledged that the Appellant already had committed the offenses in case number 33414 when she began supervising his probation in case numbers 31906 and 33049 and that the new convictions resulted from incidents that occurred almost one year before he was placed on probation. She said that the Appellant had "done well" on probation and that he passed a drug test on April 6, 2016. The Appellant worked as a truck driver and had maintained steady employment for the past one and one-half years. Wilburn said, "He struggled a little right before he went to jail but it was because with him being out on bond, I had to have him report to the office very frequently and he had trouble maintaining employment. He worked when he could."

Investigator Myers testified for the State that after Gooch purchased drugs from the Appellant in May 2014, Investigator Myers did not immediately obtain a warrant for

the Appellant's arrest or pursue a grand jury indictment. He explained, "Normally when we do controlled buys, we will wait a little while and either get indictments or possibly look at other sources." The Appellant was sentenced in case numbers 31906 and 33049 on April 13, 2015, and Investigator Myers obtained a warrant for the Appellant's arrest for the drug buys in case number 33414 on April 23, 2015. Investigator Myers did not testify at the Appellant's April 13 sentencing hearing and did not know about the sentencing hearing when he obtained the arrest warrant. Prior to Investigator Myers's obtaining the arrest warrant, the only people who would have known about the drug buys were Investigator Myers, the two investigators who assisted him with the drug buys, Johnathan Gooch, and Gooch's wife.

On cross-examination, Investigator Myers testified that he left the Lawrence County Sheriff's Department soon after he obtained the Appellant's arrest warrant. He said he did not have any firsthand knowledge about the June 24, 2016 incident report involving the Appellant and Jonathan Gooch.

The State introduced the April 2, 2015 presentence report prepared for Appellant's sentencing hearing in case numbers 31906 and 33049 into evidence. The report did not mention the drug buys. The State argued that Judge Hargrove did not know about the drug buys when she ordered split confinement.

The trial court found that the State did not present sufficient proof of the "Gooch incident" to revoke the Appellant's probation in case numbers 31906 and 33049. However, the court found that, in reviewing the presentence report presented to Judge Hargrove, Judge Hargrove was unaware of the Appellant's drug buys when she sentenced the Appellant to split confinement in those cases. The court further found that based on case law, it was authorized to revoke the Appellant's probation in case numbers 31906 and 33049 based upon the drug convictions in case number 33414. The trial court revoked the Appellant's probation and ordered that he serve the effective six-year sentence in case numbers 31906 and 33049 in confinement.

Upon finding by a preponderance of the evidence that the appellant has violated the terms of his probation, a trial court is authorized to order an appellant to serve the balance of his original sentence in confinement. See Tenn. Code Ann. §§ 40-35-310, -311(e); State v. Harkins, 811 S.W.2d 79, 82 (Tenn. 1991). Probation revocation rests in the sound discretion of the trial court and will not be overturned by this court absent an abuse of that discretion. State v. Leach, 914 S.W.2d 104, 106 (Tenn. Crim. App. 1995); see Pollard, 432 S.W.3d at 864 (concluding that abuse of discretion with a presumption of reasonableness is the appropriate standard of appellate review for all sentencing decisions). "A trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its ruling on a clearly erroneous assessment of the

- 19 -

proof, or applies reasoning that causes an injustice to the complaining party." State v. Phelps, 329 S.W.3d 436, 443 (Tenn. 2010).

In State v. Stubblefield, 953 S.W.2d 223, 225 (Tenn. Crim. App. 1997), this court held that a trial court may revoke a defendant's probation based upon criminal acts committed by the defendant before being sentenced to probation if the trial court was unaware of the prior acts at the time of sentencing. This court then stated,

> We recognize that a defendant who is granted probation has a liberty interest that is protected by due process of law. Practy v. State, 525 S.W.2d 677, 680 (Tenn. Crim. App. 1974). Also, it is fundamental to our system of justice through due process that persons who are to suffer penal sanctions must have reasonable notice of the conduct that is prohibited. United States v. Harriss, 347 U.S. 612, 617, 74 S. Ct. 808, 812 (1954); State v. Ash, 729 S.W.2d 275, 279 (Tenn. Crim. App. 1986). In this vein, a trial court would usually be unable to revoke a defendant's suspended sentence based on violations of probation conditions before those conditions are set.

> However, revoking probation based upon criminal acts a defendant committed before being placed on probation does not implicate these due process concerns because, unlike other conditions of probation that may be imposed, the defendant is deemed to have notice that his or her conduct must conform to the requirements of the law from the time of the law's enactment.

Id. Even more recently, this court, relying on Stubblefield, upheld a trial court's revocation of probation for crimes committed before a defendant was sentenced to probation when the trial court was unaware of the prior crimes at the time of sentencing. See State v. Terry Eugene Fisher, Jr., No. M2015-01388-CCA-R3-CD, 2016 WL 552727, at *2 (Tenn. Crim. App. at Nashville, Feb. 12, 2016); State v. Mark Tyre, No. W2012-01458-CCA-R3-CD, 2013 WL 1557394, at *2-3 (Tenn. Crim. App. at Jackson, Apr. 12, 2013).

We have reviewed the Appellant's sentencing hearing transcript and presentence report from case numbers 31906 and 33049, and neither mentions the May 2014 drug buys. Investigator Myers testified at the probation revocation hearing that he obtained the arrest warrant in case number 33414 ten days after the Appellant's sentencing hearing in case numbers 31906 and 33049, that he was unaware of the Appellant's sentencing hearing when he obtained the arrest warrant, and that the only people who would have known about the drug buys prior to his obtaining the warrant were himself, the two investigators who assisted with the drug buys, and Jonathan Gooch and his wife.

Accordingly, the evidence supports the trial court's finding that Judge Hargrove was unaware of the drug buys when she ordered split confinement in case numbers 31906 and 33049. Thus, the trial court did not abuse its discretion or violate the Appellant's due process rights when it revoked the Appellant's probation in case numbers 31906 and 33049 for his new convictions in case number 33414.

In a related argument, the Appellant contends that Investigator Myers's waiting almost one year to obtain the arrest warrant in case number 33414, that the State's waiting more than two years to file the probation revocation report in case numbers 31906 and 33049, and that the trial court's holding the probation revocation hearing two and one-half years after he committed the crimes in case number 33414 violated his right to a speedy trial. "The right to a speedy trial arises under the Sixth Amendment to the Constitution of the United States made applicable to the State by the Fourteenth Amendment . . . and Article 1, § 9 of the Constitution of Tennessee." State v. Bishop, 493 S.W.2d 81, 83 (Tenn. 1973). Moreover, "a probation revocation proceeding is a continuation of the criminal prosecution, and, as such, the defendant . . . has a constitutional right to a speedy trial on 'the offense of violation of the terms of probation.'" Allen v. State, 505 S.W.2d 715, 719 (Tenn. 1974). To determine whether a defendant's constitutional right to a speedy trial has been violated, this court must conduct the balancing test set forth in Barker v. Wingo, 407 U.S. 514 (1972). See State v. Wood, 924 S.W.2d 342, 346 (Tenn. 1996); State v. Baker, 614 S.W.2d 352, 353 (Tenn. 1981). Under the Barker analysis, the following four factors must be considered: (1) the length of the delay; (2) the reasons for the delay; (3) the accused's assertion of the right to a speedy trial; and (4) the prejudice resulting from the delay. Barker, 407 U.S. at 530.

A delay approaching one year between the issuance of a probation violation warrant and a probation revocation hearing generally triggers further inquiry into the remaining three Barker factors. See Allen, 505 S.W.2d at 717 (considering whether the delay of two and one-half years between issuance of the probation violation warrant and the probation revocation hearing denied the defendant his right to a speedy trial); State v. Utley, 956 S.W.2d 489, 494 (Tenn. 1997) (providing that a delay approaching one year triggers Barker v. Wingo analysis). Here, the trial court issued the probation revocation warrant on July 25, 2016, and held the probation revocation hearing just five months later. Thus, it is unnecessary for us to consider the remaining Barker factors. The Appellant's right to a speedy trial was not violated.

Although not raised by either party, our careful review of the sentencing hearing transcript for case number 33414 reveals that during the sentencing hearing, the State argued that the Appellant should serve his effective ten-year sentence in that case consecutively to "the case for which he is currently on probation, that being 31906." Defense counsel argued against consecutive sentencing "to the six years he's already on

probation for." The trial court ordered that the Appellant serve the ten-year sentence in case number 33414 consecutively to the sentence in case number 31906 but did not say that the Appellant also was to serve the ten-year sentence consecutively to the sentence in case number 33049. Moreover, the judgment of conviction for the Appellant's ten-year sentence in case number 33414 shows that the sentence is to be served consecutively to 31906 but does not show that the sentence is to be served consecutively to 33049. Tennessee Rule of Criminal Procedure 32 provides that when a judgment is silent as to concurrent or consecutive sentencing, the sentences shall run concurrently. Therefore, ordinarily, the Appellant's effective ten-year sentence in case number 33414 would run consecutively to the effective four-year sentence in case number 31906 but concurrently with the effective two-year sentence in case number 33049 for a total effective sentence in all three cases of fourteen, not sixteen, years. However, we believe that when the parties and the trial court talked about the Appellant's prior probation sentence in case number 31906, they actually were referring to his effective six-year sentence in case numbers 31906 and 33049. We note that at the Appellant's subsequent probation revocation hearing for case numbers 31906 and 33049, the trial court stated that "this Court handed down a ten year sentence consecutive to the six year sentence for which this probation hearing is now being held." Thus, the record demonstrates that the trial court intended that the Appellant serve the ten-year sentence in case number 33414 consecutively to both prior sentences for a total effective sentence of sixteen years. Accordingly, we remand the case to the trial court for correction of the judgments to reflect that the Appellant is to serve the ten-year sentence in case number 33414 consecutively to both the four-year sentence in case number 31906 and the two-year sentence in case number 33049 for a total effective sentence of sixteen years.

## III. Conclusion

Based upon the record and the parties' briefs, we affirm the judgments of the trial court but remand the case to the trial court for correction of the judgments.

_____
NORMA MCGEE OGLE, JUDGE

- 22 -